Judgment rendered July 16, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 56,316-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                        Plaintiff-Appellee

versus

CORTNEY FITZGERALD                                Defendant-Appellant
TAYLOR

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 380,953

Honorable Donald Edgar Hathaway, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for
By: Edward K. Bauman                             Defendant-Appellant

CORTNEY FITZGERALD TAYLOR            Pro Se

JAMES EDWARD STEWART, SR.              Counsel for
District Attorney                                       Plaintiff-Appellee

JASON WAYNE WALTMAN
ERIC MATTHEW WHITEHEAD
Assistant District Attorneys

* * * * *

Before COX, ROBINSON, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Cortney Fitzgerald Taylor, was charged by bill of indictment with second degree murder, in violation of La. R.S. 14:30.1. Following a trial, a unanimous jury found defendant guilty as charged. He was sentenced to serve life in prison at hard labor without the benefit of probation, parole, or suspension of sentence.

**FACTS**

Defendant, Cortney Fitzgerald Taylor, was involved in a romantic relationship with Bodicia Grant, and the couple lived together in an apartment in Shreveport, Louisiana for nearly five years. Defendant was the father of two of Ms. Grant's children. In 2020, defendant decided to "move on" from the relationship with Ms. Grant, and he moved out of the apartment.

Two or three months after defendant ended the relationship, Ms. Grant became romantically involved with Derrick Taylor ("Derrick"), who lived in the same apartment complex.[1] According to Ms. Grant, Derrick would often come to her apartment and cook meals, but he only stayed overnight on one occasion. On September 7, 2020, Derrick cooked dinner at Ms. Grant's apartment, and thereafter, the couple fell asleep in Ms. Grant's bed. While they were sleeping, defendant entered Ms. Grant's apartment and stabbed Derrick twice, once in the arm and once in the chest. Derrick died from the stab wound in his chest. Although Ms. Grant did not witness the stabbing,

---

[1] Although defendant and Derrick Taylor shared the same last name, there is no indication that they were related to each other. To avoid confusion, Derrick Taylor will be referred to as "Derrick."

she and one of her neighbors were able to identify defendant from the video surveillance footage obtained from the apartment complex.

Ms. Grant's neighbor, Marcus Young, was outside working on his vehicle on the evening of the murder, and he saw a gray Infiniti vehicle enter the parking lot of the apartment complex.[2] Young testified he saw the driver exit the vehicle and walk toward the apartment complex, but he did not see which apartment the person entered. However, he recognized the person as Ms. Grant's former boyfriend. Young stated the person returned to the vehicle shortly afterwards and left the apartment complex. Young later viewed a photographic lineup, and he identified defendant as "the girl who stayed upstairs' boyfriend." He stated defendant was the person he saw entering and leaving the apartment complex on the day of the murder.

A warrant was issued for defendant's arrest, but he remained at large for approximately three months. He was ultimately apprehended in Bossier Parish in December 2020.

Defendant was charged by bill of indictment with second degree murder for the killing of Derrick Taylor, in violation of La. R.S. 14:30.1. Prior to defendant's trial, the State filed a notice of intent, pursuant to La. C.E. art. 404(B), expressing its intent to use evidence of other crimes at trial, *i.e.*, defendant's attempt to evade arrest by firing shots at law enforcement officers when they attempted to execute the arrest warrant. Following a hearing, the trial court granted the State's request, deeming the other crimes evidence admissible.

---

[2] The investigation later revealed defendant's girlfriend owned a gray Infiniti vehicle.

During defendant's trial, Ms. Grant testified as to the nature of her relationship with defendant and Derrick. She stated she became acquainted with Derrick through her uncle, and while she was still in a relationship with defendant, she, defendant, her uncle, and Derrick would sometimes "hang out." Ms. Grant testified that on the evening of the murder, she came home from work to find Derrick cooking and eating in her apartment. She stated she went to her bedroom and fell asleep, and she was sleeping when Derrick was stabbed. Ms. Granted stated Derrick awakened her, and stated, "Baby, I'm hit," while holding his chest. She also testified Derrick began walking down the hall, and she noticed he was bleeding heavily from his chest "like a fire hydrant." Derrick fell to the floor, and Ms. Grant ran to the door to see if she could see anyone and called 9-1-1. Emergency medical personnel transported Derrick to the hospital; however, he died as a result of the stab wounds. When she was shown a surveillance video from the apartment complex, Ms. Grant identified defendant as the person depicted entering the apartment complex driving a gray vehicle, walking in the direction of her apartment, returning to the vehicle a brief time later, and leaving the complex.

Ms. Grant's neighbor, Marcus Young, testified as to what he witnessed on the night of Derrick's murder. Young positively identified defendant as the person he saw entering and leaving the apartment complex on the day of the murder.[3]

---

[3] Corporal John Adam Scheen of the Shreveport Police Department ("SPD") testified he was working as a patrol officer on the evening of the murder, and he responded to a call in reference to a stabbing. He stated when he arrived, the fire department was working on the victim. Cpl. Scheen also testified he saw "lots of blood" in the hallway, and he spoke to Ms. Grant and Mr. Young and provided their names to the detectives.

Dr. James Traylor was accepted by the court as an expert in the field of forensic pathology. He testified Derrick's cause of death was two penetrating stab wounds. One stab wound was to the back of Derrick's upper right arm. The fatal wound was to the upper chest, measured approximately 3.75 inches deep, perforated the right ventricle of Derrick's heart, and caused significant blood loss. Dr. Traylor classified Derrick's death as a homicide.

A unanimous jury found defendant guilty as charged of second degree murder. He was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court denied defendant's motions for new trial and post-verdict judgment of acquittal and his motion to reconsider sentence.

Defendant appeals.

## DISCUSSION

Defendant contends that the evidence presented at trial was insufficient to find him guilty of second degree murder. Defendant concedes that "stabbing someone with a knife to the chest may indicate specific intent to kill or inflict great bodily harm." However, he argues the fact that Derrick was stabbed twice does not prove a specific intent to kill. According to defendant, Derrick also suffered a stab wound to the back of his right arm, and it was never determined whether the nonfatal wound was

---

Detective Peggy Elzie testified she was a crime scene investigator with the homicide unit of the SPD at the time of the murder. She testified she took photographs at the crime scene and collected fingerprints and blood samples from the apartment. Det. Elzie also obtained samples of what appeared to be blood from the gray Infiniti vehicle.

Katie Traweek, a forensic DNA analyst with the North Louisiana Crime Lab, testified as an expert in forensic DNA analysis. She testified she tested the samples obtained from the gray Infiniti and discovered the matter on the swabs was not blood.

4

"defensive or offensive." Defendant also argues it was reasonable "to assume" he became enraged and killed Derrick in sudden passion or heat of blood because he "was startled" by finding Derrick in bed with Ms. Grant. Therefore, he argues the evidence was only sufficient to prove manslaughter. Defendant maintains this Court should reverse his conviction, vacate his sentence, render a judgment of conviction for manslaughter, and remand for resentencing.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Wayne*, 55,052 (La. App. 2 Cir. 6/28/23), 367 So. 3d 924, *writ not cons.*, 23-01166 (La. 2/27/24), 379 So. 3d 666; *State v. Alexander*, 51,918 (La. App. 2 Cir. 4/11/18), 247 So. 3d 981, *writ denied*, 18-0805 (La. 2/11/19), 263 So. 3d 436. The appellate court does not assess the credibility of witnesses or reweigh evidence. *Id.*; *State v. Bass*, 51,411 (La. App. 2 Cir. 6/21/17), 223 So. 3d 1242, *writ not cons.*, 18-0296 (La. 4/16/18), 239 So. 3d 830. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Wayne*, *supra*; *State v. Haley*, 51,256 (La. App. 2 Cir. 5/24/17), 222 So. 3d 153, *writ denied*, 17-1230 (La. 4/27/18), 241 So. 3d 305.

Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed

5

criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances and the actions of the defendant. *State v. Wayne, supra*; *State v. Walker*, 51,217 (La. App. 2 Cir. 5/17/17), 221 So. 3d 951, *writ denied*, 17-1101 (La. 6/1/18), 243 So. 3d 1064. Specific intent can be formed in an instant. *State v. Wayne, supra*; *State v. Alexander, supra*; *State v. Washington*, 50,424 (La. App. 2 Cir. 3/16/16), 188 So. 3d 350, *writ denied*, 16-0718 (La. 4/13/17), 218 So. 3d 119. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries and the defendant's use of a deadly weapon to produce those injuries. *State v. Wayne, supra*; *State v. Alexander, supra*. The determination of whether the requisite intent to kill is present is a question for the trier of fact. *State v. Wayne, supra*; *State v. Walker, supra*.

Manslaughter is a homicide which would be murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1). "Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors that may show less culpability than when a homicide is committed without them. *State v. Lombard*, 486 So. 2d 106 (La. 1986); *State v. Lemons*, 38,269 (La. App. 2 Cir. 4/7/04), 870 So. 2d 503, *writ denied*, 04-1288 (La. 10/29/04), 885 So. 2d 584. Provocation is a question of fact to be determined by the trier of fact. To be entitled to the lesser verdict of manslaughter, a defendant is required to prove mitigatory factors by a preponderance of the evidence. *Id.*; *State v. Mackens*, 35,350 (La. App. 2 Cir. 12/28/01), 803 So.2d 454.

In the instant case, the video surveillance footage depicted defendant

6

parking a gray Infiniti vehicle, walking to Ms. Grant's apartment, then exiting the apartment, returning to the vehicle, and driving away. The video showed defendant entering and exiting the apartment within a span of 23 seconds.

Derrick was in bed, defenseless, and unarmed when defendant entered Ms. Grant's apartment and stabbed him. There is no evidence to support defendant's claim that he killed Derrick in sudden passion or heat of blood because he was startled and "became enraged" when he saw Derrick in bed with Ms. Grant. The evidence demonstrated defendant was the one who ended the relationship with Ms. Grant, and the stabbing occurred two or three months after Ms. Grant became involved with Derrick. Considering the totality of the record, a rational trier of fact could have concluded defendant failed to establish the mitigating factors for manslaughter, provocation and heat of blood, by a preponderance of the evidence.

Moreover, the evidence was sufficient to establish that a reasonable trier of fact could have concluded defendant had the requisite specific intent to kill or inflict great bodily harm. As stated above, Dr. Taylor testified Derrick suffered one fatal wound to the upper chest, which measured approximately 3.75 inches. He was also stabbed in the arm, which may have indicated a futile attempt to defend himself. Moreover, the video evidence established that defendant entered the apartment, proceeding directly to Ms. Grant's bedroom, stabbed Derrick twice, and exited the apartment – all within a span of 23 seconds. Provided with this evidence, we find a reasonable jury could have concluded defendant arrived at the apartment armed with a knife with the specific intent to kill or inflict great bodily harm upon Derrick.

Defendant also contends the trial court erred in allowing the State to introduce evidence of other crimes, *i.e.*, firing shots when police officers attempted to execute the warrant for his arrest for Derrick's murder. He argues the events leading to his capture and arrest had nothing to do with the actual murder and should not have been relayed to the jury. According to defendant, the evidence of those alleged incident occurred three months after Derrick was killed and was "highly prejudicial and irrelevant." Defendant maintains the evidence of him firing shots at police officers prejudicial because it portrayed him "as a hardened criminal who went from allegedly stabbing someone to shooting at police officers." He also asserts the probative value of the evidence does not outweigh its prejudicial effect, and it cannot be seen as harmless error.

Contrarily, the State argues the trial court did not abuse its discretion in allowing evidence of defendant's other crimes to be introduced at trial. The State maintains that evidence of defendant's escape and attempts to evade arrest constituted admissible *res gestae* evidence. *See*, *State v. Taylor*, 01-1638 (La. 1/14/03), 838 So. 2d 729.

Generally, evidence of other acts of misconduct is inadmissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. Art. 404(B)(1); *State v. Jackson*, 625 So. 2d 146 (La. 1993); *State v. Young*, 51,101 (La. App. 2 Cir. 2/15/17), 216 So. 3d 236. This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his unrelated criminal acts. *State v. Prieur*, 277 So. 2d 126, 128 (La. 1973).

However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, *i.e.*, to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. Art. 404(B)(1); *State v. Young*, *supra*; *State v. Roberson*, 40,809 (La. App. 2 Cir. 4/19/06), 929 So. 2d 789.

Evidence of other crimes forms part of the *res gestae* when said crimes are related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. It is evidence which completes the story of the crime by showing the context of the happenings. *State v. Odenbaugh*, 10-0268 (La. 12/6/11), 82 So. 3d 215; *State v. Brewington*, 601 So. 2d 656 (La. 1992). Evidence of crimes committed in connection with the crime charged does not affect the accused's character because the offenses are committed as parts of a whole. *Id.* The inquiry to be made is whether the other crime is "part and parcel" of the crime charged and is not offered for the purpose of showing that the accused is a person of bad character. *State v. Prieur*, *supra*.

The *res gestae* doctrine in Louisiana is broad and includes not only spontaneous utterances and declarations made before or after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime if a continuous chain of events is evident under the circumstances. *State v. Odenbaugh*, *supra*; *State v. Huizar*, 414 So. 2d 741 (La. 1982). In addition, integral act (*res gestae*) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its

"narrative momentum and cohesiveness, 'with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.'" *State v. Colomb*, 98-2813 (La. 10/1/99), 747 So.2d 1074, 1076 (quoting *Old Chief v. United States*, 519 U.S. 172, 186, 117 S. Ct. 644, 653, 136 L. Ed. 2d 574 (1997).

In *State v. Taylor*, *supra*, the defendant objected to the State's introduction of the *res gestae* evidence, *i.e.*, the other crimes committed while he and Timothy Taylor were "on the run" after they killed a car salesman in DeSoto Parish.[4] The Supreme Court found the evidence was admissible, stating:

> Although defendant contends the evidence of other crimes was erroneously admitted as *res gestae* because the crimes involved different victims in different states, over a seven-day span, as discussed above, the doctrine of *res gestae* is designed to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.
> ***
> At first blush, defendant seems correct that the events happening in far-away Iowa, Kansas, and in Texas at the Mexican border, occurring within a seven-day span of time, could not possibly qualify under a doctrine meant to place the charged crime in its *immediate* context of happening near in time and in place. Clearly, as the state traced the movements of defendant and Timothy Taylor, the events detailed by its evidence, especially after the bank robbery in Iowa, became increasingly remote in time and in place, so much so that it would be difficult if not impossible to say the charged crime

---

[4] Michael and Timothy Taylor went to a car dealership in DeSoto Parish and asked to test drive Pontiac Firebird. During the test drive, they shot and killed the car salesperson, left his body on a bridge, and fled in the Pontiac. The following day, Michael and Timothy used the Pontiac in a bank robbery, high speed chase, and the non-fatal shooting of a police officer in Iowa. Officials found the Pontiac abandoned in Missouri. Michael and Timothy stole another vehicle in Kansas and continued their flight. Two days later, they were apprehended in Laredo, Texas, after they attempted to cross the border into Mexico.

> gave defendant notice of the truck theft in Kansas or the currency reporting violation at the Mexican border.
>
> However, under the rule of narrative completeness incorporated in the *res gestae* doctrine "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."

*Id*., at 742-43 (internal citations omitted).

In this case, in December 2020, law enforcement officials received a tip from Crime Stoppers and were able to trace defendant's location to a residence on Henderson Street in Shreveport. Seargent Joel Davidson of the Shreveport Police Department ("SPD"), who was also serving as a member of the United States Marshals Task Force, conducted surveillance on the residence. At the hearing, Sgt. Davidson testified he observed defendant and a woman arrive at the residence, exit a vehicle, and enter the house, so he called for the rest of the task force and a K-9 unit.[5] The officers knocked on the door of the residence, and the woman answered and verbally denied defendant was there; however, according to Sgt. Davidson, the woman silently indicated defendant was inside the residence. The officers obtained the woman's consent to enter and search the residence, and two officers and a K-9 entered the home. The officers began searching the home room by room, calling defendant's name along the way. The K-9 gave a positive alert on a bedroom door, and two gunshots were fired from the bedroom.[6]

---

[5] The license plate on the gray vehicle in the driveway matched the license plate on the vehicle seen in the surveillance footage the night Derrick was killed.

[6] Officer Matthew Dixon of the SPD investigated the scene. He found two spent 9 mm casings on the floor and two projectiles in the wall of the back bedroom. Officer Dixon surmised the bullet went through the door, ricocheted on the ground, and lodged into the wall. Defendant was charged with two counts of attempted first degree murder of a police officer, in violation of La. R.S. 14:27(A) and 14:30(A)(2), due to allegedly

11

Sgt. Davidson entered the bedroom and saw defendant jump out of a window and flee. He testified that the presence of another dog in the backyard prevented them from using the K-9 to apprehend defendant. Defendant was captured in Bossier City three days later.

We find the evidence regarding the events surrounding law enforcement's efforts to execute the warrant for defendant's arrest was admissible at trial. Defendant fled the scene immediately after he killed Derrick, and he remained at large for approximately three months. Thereafter, law enforcement officials received an anonymous tip as to defendant's location, and the officers attempted to execute the arrest warrant. During the officers' attempt to execute the warrant for defendant's arrest for killing Derrick, defendant fired shots at the officers and successfully evaded arrest. Based on these facts, we find the police officer's testimony was admissible under the *res gestae* exception. This assignment lacks merit.

## CONCLUSION

For the reasons set forth herein, we affirm defendant's conviction and sentence.

**CONVICTION AFFIRMED; SENTENCE AFFIRMED.**

firing two shots at law enforcement officers. The attempted murder charges remain pending.

12